UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GERALD J. DEMENNA, individually and
d/b/a CHEM-CHEK CONSULTING,

                              Plaintiff,

    – against –

BUCK SCIENTIFIC, INC., ROBERT J.
ANDERSON, and ERIC ANDERSON,

                              Defendants.

CIVIL ACTION
07 CV 6240 (LAP)
CASE NO. 07CV6520 (LAP)

**AFFIDAVIT OF**
**GERALD J. DEMENNA**
**IN SUPPORT OF**
**TEMPORARY**
**RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

STATE OF NEW JERSEY    )
                       ) ss.
COUNTY OF BERGEN       )

        GERALD J. DeMENNA, being duly sworn, does hereby depose and say:

        1.      I am the Plaintiff in this action; as such, I am fully familiar with the facts and circumstances set forth herein.

        2.      I make this Affidavit in Support of Plaintiff's Order to Show Cause seeking an Order of the Court:

        a.  publishing, distributing, and/or rendering any statement concerning the purported basis for Plaintiff's termination of services for Buck Scientific, except in response to written request for same by a third-party seeking references with regard to hiring the Plaintiff;

        b.  voluntarily contacting any third-party for the purpose of publishing, distributing, and/or rendering any statement concerning the Plaintiff and/or his performance of the services for which Buck Scientific engaged him;

        c.  reviewing, accessing, copying, disseminating, and/or utilizing in any manner the confidential and proprietary information that had been stored on Plaintiff's personal computers on or before June 18, 2007:

3.      This action stems from the termination of my employment relationship on June 18,

2007 in retaliation for my reporting an apparent transshipment of scientific equipment to an end-user

with links to Tehran Iran, to the Department of Homeland Security and Department of Commerce.

In apparent response to my reporting this suspicious shipment, I was physically assaulted and

injured, my personal property detained, my personal automobile seized, my confidential and

proprietary information stolen, and my reputation slandered and libeled by the Defendants.

4.      Although my attorneys requested on Tuesday, Jun 26, 2007, that the Defendants cease

and desist from using the information that they unlawfully obtained from my personal computers and

that they stop communicating with my personal contacts and business relations, Defendants have

failed and refused to even respond to my attorneys, thus necessitating this application.

5.      Since June 18, 2007, I have been forced to renegotiate an existing consulting

agreement on less favorable terms, based upon the defamatory communications of Defendants to that

company.  If Defendants are permitted to continue their slanderous and libelous attacks on my

reputation, destroying existing business relationships, I will be unable to continue working.

6.      Accordingly, I request that this Court temporarily restrain and preliminarily enjoin the

Defendants from:

      a.   publishing, distributing, and/or rendering any statement concerning the purported
basis for Plaintiff's termination of services for Buck Scientific, except in response to
written request for same by a third-party seeking references with regard to hiring the
Plaintiff;

      b.   voluntarily contacting any third-party for the purpose of publishing, distributing,
and/or rendering any statement concerning the Plaintiff and/or his performance of the
services for which Buck Scientific engaged him;

      c.   reviewing, accessing, copying, disseminating, and/or utilizing in any manner the
confidential and proprietary information that had been stored on Plaintiff's personal
computers on or before June 18, 2007:

2

## **BACKGROUND**

7.      I have been an analytical chemist for thirty-two (32) years. I earned a Bachelor of Science Degree from Rutgers University, in 1980 and was awarded my Ph.D. in Chemistry from the University of Ravenhurst, Texas, in 1994.

8.      Since 1990, I have been presented Science Teacher workshops in New Jersey and the tri-State region. Since 1999, I have been teaching Chemistry to undergraduate and graduate students at Sacred Heart University in Fairfield, Connecticut as an Adjunct Professor. In addition, this spring, I taught on-line Chemistry at Abertus Magnus College in New Haven, Connecticut in the Spring 2007 semester.

9.      Following the award of my Ph.D. in 1994, I held various consulting positions with several companies, applying analytical chemistry for those companies.

10.      Analytical chemistry involves determining the chemical composition of unknown substances using some form of analytical instrumentation. This analytical testing is typically performed by comparing chemical reactions of known substances to the reactions of the target substance, in order to positively identify the unknown substance. My role is to develop a process by which these unknown substances can be identified and train the analytical personnel in the correct use of that particular instrument. By starting with a basic discriminator, the laboratory technician will perform additional tests, based upon the results that are obtained, ultimately refining the testing until the unknown substance can be positively identified. Once created, these protocols must be validated, before they can be used reliably by a testing facility; and provided this service.

3

11.    In 1989, I decided to stop working for other people and created my own consulting firm, Chem–Chek, a sole proprietorship, with offices located in Piscataway, New Jersey.

12.    In addition to creating and validating analytical chemistry protocols, and providing training in the use of analytical instruments, I began to manufacture and market chemical compounds through Chem–Chek.  I also began to actively market scientific educational materials to various schools, creating the FUN-SCIence Academics Group as another independent part of Chem–Chek. As part of this educational marketing, I commissioned a tie-dyed lab coat, which I have worn for all of my educational seminars.  Since first wearing the coat in 1990, it has become uniquely associated with me and I now wear the coat for virtually all of my public appearances and seminars.  A photograph of me giving a presentation in the coat is annexed hereto as Exhibit A.

## ASSOCIATION WITH DEFENDANT BUCK SCIENTIFIC, INC.

13.    In or around 1991, I was contacted by defendant Robert Anderson, President of defendant Buck Scientific, Inc. ("Buck Scientific"), or its then General Manager Roy Mirchandani, to provide chemicals and analytical chemistry protocols for Buck Scientific's use.  Buck Scientific is a manufacturer and OEM supplier of scientific instruments that measure chemical properties, such as infrared spectrometers; atomic absorption spectrophotometers; gas chromatographs; liquid chromatographs; ultra violet visible spectrophotometers, and fluorometers.   These various instruments measure known chemical properties and can be used to identify unknown substances.

14.    After about a year of providing chemicals and analytical chemistry protocols, I was approached about entering into an independent contractor relationship with Buck Scientific, primarily as a technical consultant with an emphasis on sales and utilization of the various Buck

4

Scientific products. Together with the independent sales representatives, I would visit prospective customers, evaluate their unknown samples, and demonstrate how Buck Scientific's instruments could meet their analytical needs. Initially, I received a weekly service fee of approximately Two Hundred and Fifty ($ 250) Dollars. It was anticipated that I would only devote approximately twelve (12) hours per week to assisting the sales representatives in marketing Buck's instruments, while the remainder of my time could be used for any other purpose, including, but not limited to, operating Chem–Chek, selling other scientific instruments of the types that Buck Scientific did not produce, and any other venture I may have had.

15.    Over the past fifteen (15) years, the amount of time that I have devoted to providing services for Buck Scientific has increased over four-fold. As of June 2007, I was devoting a minimum of forty (40) hours a week to Buck Scientific, in addition to the time I would spend on Chem–Chek and other business ventures.

16.    As of June 2007, I had received an increased weekly service fee of Nine Hundred and Eighty ($ 980) Dollars, together with one–one-hundredth (.01 %) percent of Buck Scientific's sales, paid monthly, and reimbursement of travel expenses associated with my services rendered to Buck Scientific. Over the 15 years I have been associated with Buck Scientific, Defendant Robert Anderson routinely failed and refused to reimburse a significant portion of my expenses related to travel conducted at the request of Buck Scientific. Regardless of whether I conducted any other business, I was repeatedly forced to personally pay for travel expenses associated with Buck Scientific that should have been reimbursed by the company.

17.    At no point in time, did I ever become an employee of Buck Scientific, nor have I ever entered into a non-compete agreement with Buck Scientific

5

18.    I have continued to operate Chem–Chek, manufacture and produce specialty chemicals, quote and provide technical services upon request, and to market scientific educational materials to various institutions.

19.    As an independent contractor, I have been contacted by numerous prospective customers whose needs could not be met by Buck Scientific, either because Buck Scientific did not manufacture the necessary equipment, or offer the necessary services. On such occasions, I would offer my assistance and obtain appropriate equipment for the customer, or provide the requested services. In return for my assistance, I typically received either part of the independent sales representative's commissions, a sales commission directly from the equipment's manufacturer, or some other stipend.

20.    Part of my business requires that I attend various conferences, conventions, etc., in addition to conducting my own business; I would also help market Buck Scientific equipment. Regardless of who had requested that I attend a particular event, I would always appear in my distinctive tie–dye lab coat, which has become synonymous with me and is well known in the industry as being associated with me.

## THE SUSPICIOUS PACKAGE

21.    Buck Scientific's overseas sales account for thirty-five to forty (35–40 %) percent of its business. I believe that the main reason for this rather large percentage is that Buck Scientific's instruments are smaller and cheaper than the comparable competitors' products.

22.    In December 2006, I was contacted by a sales person at Buck Scientific about two prospects for overseas sales for which he could not satisfactorily identify the end-users. The sale was

6

for four (4) instruments, totaling approximately One Hundred and Thirty Thousand ($ 130,000) Dollars, which was a rather large order for Buck Scientific.

23.     The available documentation identified the one of the sales groups as Dr. Mamoud Akid, SCO Gmbh, located in Germany. The documents also indicated that the equipment was to be used by an unidentified university located in Dubai, in the United Arab Emirates. Because the information on the documentation was incomplete, I was asked to help positively identify Dr Akid and the ultimate end-user.

24.     It is my understanding that, since September 11, 2001, the federal government has placed significant restrictions on the export of scientific instruments. The shipping manger told me that he would not authorize the shipment, under his name, unless the ultimate end–user could be identified

25.     In researching Dr. Akid, and based on correspondence from another overseas distributor of BUCK Scientific instruments), the shipping personnel and I determined that while Dr. Akid may have had an office located in Germany, his primary office was located in Tehran, Iran, and conducted his business practices there. Our research also failed to locate any definitive reference to the university in Dubai that the documentation stated was to be the ultimate end-user for the equipment.

26.     I revealed the results of this research to defendant Robert Anderson; sent him an e-mail regarding same and even drafted a letter to Federal agents at the Department of Homeland Security and Department of Commerce regarding the shipment, in order to protect Buck Scientific. A copy of my e-mail and draft correspondence, which had been given to defendant Robert Anderson, is annexed hereto as Exhibit B.

7

27.    Defendants Robert Anderson and Eric Anderson failed and refused to contact the Departments of Homeland Security and/or Commerce despite my repeated requests. I had also learned that Buck Scientific had received a $130,000 payment for the same order from another overseas distributor of BUCK Scientific instruments.

28.    When I was convinced that defendants Robert Anderson and Buck Scientific were not going to act upon these suspicions and that the scientific instruments would be shipped to Dr. Akid, I contacted the Department of Homeland Security and Department of Commerce Field Offices in New Haven, Connecticut, to inform them of the situation.

29.    Homeland Security and Department of Commerce agents visited Buck Scientific, where they conducted an investigation into the shipment. Ultimately, on or around February 1, 2007, the Department agent said they would likely place some type of a tracking device in the equipment to make sure that it was not used for improper purposes.

30.    Defendants Robert Anderson and his son, Eric Anderson, the Sales Manger for Buck Scientific, were not at all happy about this added inconvenience. Eric Anderson delayed determining which of the two (2) payments that Buck Scientific had received for the one (1) order would be retained, and to which address the order would be shipped.

31.    Interestingly, even though Buck Scientific has received and retained the payment for those four (4) instruments from Dr. Akid, SCO Gmbh, in the amount of approximately One Hundred and Thirty Thousand ($ 130,000) Dollars, the Defendants have not paid me or the sales agent, the commissions associated with the sale.

## TERMINATION OF MY RELATIONSHIP WITH BUCK SCIENTIFIC

32.    On Saturday, June 16, 2007, I received an E-mail from one of my students at Sacred Heart University stating that Buck Scientific had a web posting for a position of Analytical Chemist. When I investigated the advertisement, I found that the description of the position mirrored my job functions completely.

33.    I e-mailed defendant Eric Anderson on Sunday, June 17, 2007, at his personal address, asking whether Buck Scientific was finally hiring an assistant for me, given all of the travel time involved in my position. I did not even receive the courtesy of a response to this e-mail.

34.    On Monday, June 18, 2007, at 5:30 p.m. when there were no other employees in the building, I was called into the office of defendant Robert Anderson. When I arrived, defendant Eric Anderson was also present; both defendants appeared to be agitated.

35.    Defendant Robert Anderson then told me that he was "tired of all my extracurricular activities," of "trying to mess up the sale to Digilab, because I didn't want it to happen" and accused me of "stealing from the company." Specifically, I had supposedly diverted a prospective contract with Ohio State University to a company known as Edu–Chem Innovations, operating out of Florida.

36.    Contrary to the defendants' unfounded allegations, Ohio State would not have contracted with Buck Scientific; as the University required instruments that Buck Scientific neither manufactured nor distributed. While Edu-Chem may technically be a competitor of Buck Scientific, the two product lines are incompatible; at that time, Edu-Chem distributed instruments that Buck Scientific does not produce nor distribute.

P:\DeMenna, Jerry\Pleadings\GJD Aff in Support of OSC for TRO (v3).doc

37.    Even though I attempted to explain the situation to the defendants, they refused to listen. I was told to "get the hell out of" Buck Scientific "now!"

38.    I left the office and went to my cubicle to retrieve my personal belongings. As I approached my desk and prepared to pack up my personal paper files and two (2) personal notebook computers, defendant Eric Anderson struck me in my chest, pushing me away from the computers. When I had recovered and again attempted to secure my personal computers, defendant Robert Anderson prevented me from doing so by seizing my left arm from behind, wrenching my shoulder. I was dragged away from my personal possessions and to the front door.

39.    When I stated that I needed my personal belongings, I use my computers to teach my courses at Sacred Heart University and my own laboratory work, defendant Robert Anderson told me that I would get my personal property, when I returned the instruments that I used to demonstrate Buck Scientific's products.

40.    As both defendants knew, this equipment was located in three (3) separate locations, Sacred Heart University, my personal lab facility in the Bronx, NY, and in a warehouse in Piscataway, NJ, where the other sales agents had access to the equipment in order to provide demonstrations for prospective customers.

41.    When I attempted to leave, defendant Robert Anderson grabbed the keys to my personal car from my hand. He then threw the keys to the company truck at me and said, "go get all of my s - - t."

42.    On Tuesday June 19, 2007, I collected the various equipment, using Buck Scientific's truck. I also called the Norwalk Police Department, complaining about the conduct of the defendants

10

the previous evening. The Duty Officer told me to finish gathering up the demonstration equipment and, if I felt nervous about returning to Buck Scientific, that a police officer would be dispatched to accompany me.

43.     At approximately 4:00 pm, I met with Officer Mark Devito of the Norwalk Police Department at the police headquarters and gave him a summary of the previous evening's events. I also showed Officer Devito a partial list of my personal items, as best as I could remember, that had been held hostage by the Defendants, as well as a list of the equipment I had collected that day. Officer Devito entered an Incident Report and told me to follow him over to Buck Scientific. A copy of Officer Devito's Incident Report is annexed hereto as Exhibit C.

44.     Officer Devito and I met with defendants Robert and Eric Anderson in Buck Scientific's entranceway. Officer Devito told defendant Robert Anderson that, since I had returned his equipment, he wanted the defendants to return my property. The defendants initially refused to return my property and I requested that Officer Devito arrest the defendants for theft of my property. Eventually, the defendants reluctantly agreed to release my property, under the threat of arrest, after they had checked the equipment that I was returning.

45.     The defendants accepted the list that I had prepared concerning the equipment I was returning and signed off in receipt of those items. A copy of the executed Demonstration Equipment List is annexed hereto as Exhibit D.

46.     The defendants also acknowledged that they were returning the "personal property of Gerald J. DeMenna that was illegally seized on Monday, 18 June 2007." A copy of the executed Personal Property List is annexed hereto as Exhibit E.

11

47.    All of my personal property was returned with one exception: Defendants retained a 2GB memory card from the company issued TREO cellular telephone. Even though Buck Scientific had provided me with the cellular phone, the memory card was my personal property; I had purchased and installed the card. The card contains my private business contacts' information, work / travel schedule calendar, personal and professional documents, and personal pictures.

48.    Once the defendants and I had executed the two lists, I departed Buck Scientific in my own car, leaving the company truck with the defendants.

## SUBSEQUENT EVENTS

49.    On Tuesday evening, I received a telephone call from Nancy Gregorio of Edu-Chem Innovations informing me that she had received a letter from Defendant Robert Anderson stating that I had been terminated for diversion of customers and theft. A copy of this letter is annexed hereto as Exhibit F. Edu-Chem Innovations was not the only recipient to of such disparaging correspondence. Annexed hereto as Exhibit G are copies of such correspondence.

50.    When I turned on my notebook computers on Wednesday, June 20, 2007, I noticed that several of the desktop icons had been deleted. These icons were for program files for analytical instruments some of which were associated with Buck Scientific; other programs were associated with instruments used by me at Sacred Heart University and in my own personal lab. Further investigation revealed that the defendants had not only deleted the icons, they had deleted the program files from my computers, including the last six (6) months of data files associated with these instruments. Based on the defendants' rudimentary attempts to disguise their destruction of my personal property by discarding the computers' recycle bins, I cannot determine, at this time, whether

12

the deleted programs and data were transferred to the defendants' computers or simply destroyed. A copy of my desktop showing the deleted icons is annexed hereto as Exhibit H.

51.     When I tried to recover the deleted programs and files, a virus began running. That virus has prevented me from using my computers productively since that date.

52.     Based upon a review of my e-mail history, I have been able to determine that the defendants forwarded the last six (6) months worth of my electronic mail to defendant Eric Anderson. Annexed hereto is Exhibit I, is a sample listing of the e-mails that were forwarded to eric@bucksci.com, which is defendant Eric Anderson's business e-mail address. The date and time stamp indicate that all of these messages were forwarded on Monday, June 18, 2007, following my forcible departure from Buck Scientific.

53.     Based on these activities, it is apparent that the defendants' insistence that I return the demonstration equipment was merely a subterfuge to retain my personal computers in order to steal and/or destroy my personal information.

54.     Within a week of the transmission of the defendants' e-mail accusing me of theft, I received numerous inquiries concerning the message from Chem Chek clients and have been forced to defend myself and my reputation to these new and long-term clients who have had no relationship to Buck Scientific, among others.

55.     On Tuesday, June 26, 2007, I received a disturbing phone call from a company with whom I have a two (2) year Consulting Agreement with in Ohio, MeasureNet Technology. The Consulting Agreement provides for the issuance of an equitable share of the company at the six (6) month point, together with an option for increased time commitment at comparable fee increase.

The President of MeasureNet has indicated that he wishes to re-negotiate that Agreement on les favorable terms, based on the allegations made by the Defendants.

## CONCLUSION

56.    It is quite clear the Defendants are engaging in a deliberate plan to besmirch my reputation and take over my personal business.  More significantly, despite having voluntarily terminated my services as an independent contractor, the Defendants continue to use my confidential and proprietary materials to market their own products.  As demonstrated in the examples annexed hereto as Exhibit J, many of the marketing materials for Buck Scientific contain my Fun-Science logo and market my FUN-SCIence program and marketing information.

57.    In addition to the attacks on my professional life, the Defendants' actions have seriously impacted my personal life.  I feel that my reputation has been permanently tarnished by the Defendants' insupportable accusations.  Since June 18, 2007, I have been unable to sleep nor been able to eat properly, and had to seek help from a psychologist to deal with the terrible stress and anxiety of this situation.  I also had to see my orthopedist to treat the damage I received at the hands of defendants Robert and Eric Anderson.

P:\DeMenna, Jerry\Pleadings\GJD Aff in Support of OSC for TRO (v3).doc

58.    I am relying on prescription medications to maintain a normal circadian rhythm, to allow me to try and eat normally, and had to receive an injection and additional therapy to recover the use of my left arm and shoulder . I have lost weight and can still not eat a normal meal.

59.    Further, the loss of income from Chem-Chek and my other business ventures will negatively impact more lives than my own. I am responsible for support payments for my ex-wife, and two children, one of whom is mentally disabled. Defendants' negative publicity campaign will seriously jeopardize my ability to provide the resources necessary to take care of my child's special needs.

60.    The Defendants have rejected my attorneys request to cease and desist from their unlawful actions. Accordingly, I am requesting that this Court issue an Order

   a.    publishing, distributing, and/or rendering any statement concerning the purported basis for Plaintiff's termination of services for Buck Scientific, except in response to written request for same by a third-party seeking references with regard to hiring the Plaintiff;

   b.    voluntarily contacting any third-party for the purpose of publishing, distributing, and/or rendering any statement concerning the Plaintiff and/or his performance of the services for which Buck Scientific engaged him;

   c.    reviewing, accessing, copying, disseminating, and/or utilizing in any manner the confidential and proprietary information that had been stored on Plaintiff's personal computers on or before June 18, 2007:

_____
                                        GERALD J. DeMENNA

Sworn to before me
this 5th day of July 2007.

_____
                 Laura Brears
             Notary Public
    Notary Public of New Jersey
My Commission Expires June 23, 2012                    15

P:\DeMenna, Jerry\Pleadings\GJD Aff in Support of OSC for TRO (v3).doc