```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
GERALD J. DEMENNA, individually     :   07 CV 6240 (LAP)
and d/b/a CHEM-CHEK CONSULTING,     :
                                    :   AFFIDAVIT IN OPPOSITION
              Plaintiffs,           :   TO MOTION FOR
                                    :   PRELIMINARY INJUNCTION
     -against-                      :   AND IN SUPPORT OF
                                    :   DEFENDANTS' CROSS-MOTION
BUCK SCIENTIFIC, INC., ROBERT J.    :
ANDERSON, and ERIC ANDERSON,        :
                                    :
              Defendants.           :
                                    :
------------------------------------x
                                    :
BUCK SCIENTIFIC, INC.,              :
                                    :
        Counterclaim Plaintiff,     :
                                    :
     -against-                      :
                                    :
GERALD J. DEMENNA,                  :
                                    :
        Counterclaim Defendant.     :
                                    :
------------------------------------x

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )
```

ERIC ANDERSON, being duly sworn, deposes and says:

1. I am Director of Sales and Marketing of defendant Buck Scientific, Inc. ("Buck Scientific"). I am also an individual defendant, as is my father, Robert Anderson, the owner and principal executive of Buck Scientific. I am

fully familiar with the facts of this matter, and I make this affidavit, aware of the penalties of perjury:

    (a) in opposition to the motion of plaintiff Gerald DeMenna ("DeMenna") for a preliminary injunction, a motion by which DeMenna seeks to prevent Buck Scientific from attempting to repair the damage which DeMenna has caused our business; and

    (b) in support of defendants' cross-motion for a preliminary injunction seeking an Order of this Court to prevent DeMenna from using, capitalizing on, selling, transferring or otherwise reaping competitive benefits from the customer data, "leads" and other proprietary business information of Buck Scientific which DeMenna loaded onto his own computer while he was still connected with Buck Scientific and apparently retains today.

Summary of Facts

    2. Setting aside the literally dozens of irrelevant facts which fill plaintiffs' moving papers, such as tie-dyed lab coats and purported threats to national security which never happened, the true facts of this matter are straightforward.

    3. My father, defendant Robert J. Anderson, is the chief officer, director and owner of Buck Scientific. I have worked for Buck Scientific since 2000, after having

2

been honorably discharged from four years of service in the United States Navy. I subsequently became Director of Sales and Marketing of Buck Scientific, the position I hold today.

4. Buck Scientific sells a variety of scientific instruments, including certain instruments used to analyze chemical compounds. Buck Scientific manufactures many of the instruments it sells, but also re-sells instruments manufactured by other companies.

5. DeMenna has had a business consultancy relationship with Buck Scientific for well over a decade. During that time, DeMenna earned well over a million dollars from Buck Scientific by providing certain consulting services and selling supplies to Buck Scientific.

6. DeMenna, who is an analytical chemist, was asked to work closely with our sales staff to promote Buck Scientific's sales. For this service, DeMenna received a weekly stipend and a percentage of Buck Scientific's sales, amounting to meaningful compensation for him over many years. Based on our trust that he would act in the interests of Buck Scientific rather than those of our competitors, he was exposed to the inner workings of our

business and had access to vital information about our customers.

7. As DeMenna admits, his consulting agreement with Buck Scientific was an oral agreement. It had no set term, as he is also bound to admit. Further, he cannot claim that there was any prohibition against Buck Scientific terminating his consultancy at any time or for any reason.

8. And, in fact, in early June of this year, we did terminate DeMenna's consultancy with Buck Scientific after we learned that DeMenna was brazenly diverting our customers to a competitive business in Florida, more details of which are set forth below. DeMenna's contention that his consultancy was terminated because we were "annoyed" that he had reminded us of our national security obligations is pure fantasy on his part, just as DeMenna's lawsuit is a "best defense is a good offense" attempt to distract the Court's attention from his own improprieties.

9. In addition, after DeMenna's consultancy was terminated on June 18, we ascertained that DeMenna, during his consultancy, had downloaded proprietary business information of Buck Scientific, including an abridged customer list, considerable data on "leads" to prospective customers and other business correspondence, onto his own computer. This information constitutes an important asset

4

of Buck Scientific. Since we have learned that DeMenna is in possession of our proprietary information, we are asking the Court to prevent him, during the pendency of this litigation, from making competitive use of (or any other profit from) that data.

10. Accordingly, based on the facts more fully set forth herein, and the accompanying legal arguments, it is respectfully submitted that DeMenna's motion for a preliminary injunction should fail and that, by contrast, a preliminary injunction should issue to prevent DeMenna from making competitive or other improper use of Buck Scientific's proprietary information, i.e., Buck's customer list and "leads."

The History of This Matter

11. Gerald DeMenna's consultancy with Buck Scientific began, I am informed, in the early 1990s. My father, Robert Anderson, decided that Buck Scientific could use DeMenna's skills as an analytical chemist to assist our salespeople. For one instance, sometimes a customer calls Buck Scientific with an idea about what analytical chemistry result they are seeking, but not knowing which, if any, of our instruments is best suited for their particular needs. Accordingly, it was believed that DeMenna could help our sales force, among other things, to

match the right equipment to the right customers. For his consulting services, DeMenna was to be compensated by a set fee and a percentage of Buck's sales. DeMenna would also receive reimbursement of his legitimate expenses, an item which grew meaningfully as he traveled on Buck Scientific's behalf. Significantly, DeMenna's consultancy agreement with Buck Scientific was never reduced to writing, but remained, as DeMenna admits, purely an oral agreement. There was no set term, and either party could terminate the consultancy at any time.

12. Over the years, DeMenna's compensation from Buck Scientific increased significantly. During the ten-year period between 1996 and 2006, Buck Scientific paid DeMenna in excess of $1 million for services and supplies (an average of over $100,000 per year), as indicated by the attached copies of the yearly Form 1099 supplied to him during that period (Exhibit "A" hereto).

13. Although we did know that DeMenna's consultancy with Buck Scientific was "non-exclusive" in the sense that he had other jobs and other sources of income, such as his adjunct teaching position, it was understood that DeMenna would not assist the sales efforts of our direct competitors (i.e., companies who sold the same or similar equipment as Buck Scientific sells or could sell).

The First Incident of
DeMenna's Dishonesty

14. By 2004, DeMenna's consultancy with Buck Scientific had lasted a decade or more. DeMenna had been well compensated for assisting Buck Scientific. Accordingly, the Court can imagine our surprise when in May of that year we caught DeMenna red-handed in the act of attempting to steal from Buck Scientific.

15. As best as I can reconstruct the specifics, I believe that a customer named Tim McCall of T.E.G. North West contacted Buck to see if he could acquire an instrument called the "Buck 210VGP" for less than the $11,000 list price for a new instrument. We later figured out that DeMenna had taken that call and, without telling anyone, removed a used, demonstration model of the Buck 210VGP from a shelf at our premises, boxed it up and drove it to Newark Airport, where he sent it Federal Express to the prospective customer in Washington State.

16. At about this same time, the equipment was discovered missing from our premises. DeMenna explicitly denied knowing anything about its whereabouts. Fortunately for us, when the instrument arrived in Washington State, the customer could not get it to work, and so contacted another of Buck Scientific's employees for help. Based on

this second inquiry, we learned that someone had sent this customer the stolen instrument. We then learned that the customer also had received a bill for the instrument not from Buck Scientific but from Chem-Chek, Gerald DeMenna's company.

17. When these pieces were put together, my father immediately confronted DeMenna. I was present, along with another employee, at that confrontation in 2004. I heard my father tell DeMenna that we had evidence showing that DeMenna had stolen the instrument, shipped it to the customer, and billed for it under his own company name. DeMenna became violently ill and ran to the men's room. When he emerged, he did not deny the accusation, but apologized profusely and begged for another chance to remain with Buck Scientific, stating "I won't ever do this again." In fact, at no time did he deny that he had stolen Buck Scientific's goods and attempted to profit personally from their sale.

18. Given DeMenna's long history with Buck Scientific, my father decided to give him another chance. As it turned out, however, that was "the good deed which did not go unpunished," when, earlier this year, DeMenna proved himself unable to deal with us fairly and honestly.

The Events Leading Up to
the Termination of DeMenna's
Consultancy in June of this Year

19. Buck Scientific did terminate Gerald DeMenna's consultancy on June 18, 2007. The events which led up to this termination of DeMenna's consultancy apparently began months earlier, but climaxed when, in the week preceding June 18, I acquired definite information which convinced us that DeMenna was, contrary to every accepted standard of loyalty and propriety, actually diverting our customers to a company in Florida named Edu-Chem Innovations, with which DeMenna himself was somehow connected.

20. The information with which we traced DeMenna to this impropriety started to emerge in March of this year, when I attended an important scientific equipment trade show referred to as the "Pittsburgh Conference." DeMenna accompanied me to this trade show, which offers an important opportunity for Buck Scientific to meet both suppliers and customers.[1]

21. As was customary, Buck Scientific paid for DeMenna's expenses to attend the Pittsburgh Conference, and

---

[1] With respect to that part of Buck Scientific's business which is concerned with re-selling the equipment of other original equipment manufacturers ("OEMs"), our suppliers are almost as important as our customers, since Buck Scientific's profit on the resale of instruments produced by another OEM often depends on the discount which that OEM gives Buck Scientific on the equipment we resell.

9

DeMenna was there, to the best of my belief, solely to further the business interests of Buck Scientific.

22. At the Pittsburgh Conference, I saw a woman named Nancy Gregorio, whom I had met a few years earlier. I understood that she worked for Berghof America, a Florida company which supposedly was a sales representative for Berghof, a German manufacturer. At the Pittsburgh Conference, DeMenna told me that Ms. Gregorio was still connected with Berghof America, so when I later saw DeMenna taking Ms. Gregorio around the show to introduce her to a number of our suppliers, it seemed slightly odd to me. At the time, I did not know what to make of this.

23. Also in March of this year, we had another odd incident. We received an inquiry to buy and resell a piece of equipment called an Acid Distillation System, which was manufactured by Berghof. In the course of this inquiry, Gerald DeMenna told us that Buck Scientific could not pursue this transaction and resell this instrument because Berghof America had an exclusive sales arrangement with Berghof. This seemed strange, because we had, in fact, sold one of these same systems to a customer in 2006. From the nature of the conversations, it seemed like DeMenna was attempting to discourage us from pursuing this sale. I could not figure out why.