24. There were other unexplained happenings between March and June. DeMenna was attending more trade shows than he had previously, all at the expense of Buck Scientific. Nonetheless, our business fell off in a meaningful way during those months, and we could not identify the source of the problem. We were spending as much or more time and money on marketing as we had during the previous comparable time period, but the results were actually weaker.

25. Finally, in the week before June 18, an incident occurred which finally alerted us to the fact that DeMenna was dealing falsely with Buck Scientific.

26. On or around June 15, 2007, Stephen Zakrewski, an employee of Buck Scientific, received a telephone call from Dr. Barry Friedman of Ohio State University. Dr. Friedman said that he was calling to confirm the price of "our model 6320." Although the list price of the instrument involved was over $1,700, Dr. Friedman reported that Gerald DeMenna had quoted him a price of $1,500 per unit.

27. Dr. Friedman also indicated that he anticipated placing an order for 80 such instruments, which is a sizeable order for us, and could have justified a discount. Nonetheless, when this interchange was reported to us, we recognized that something was amiss. The "red flag" was

11

that Friedman was referring to the instrument by the number given to it by its manufacturer, a company called Techne. When Buck Scientific sells this instrument, we refer to it as the "Buck VIS 100." This is the name we believe DeMenna would have used if he were operating on Buck's behalf. Suddenly we started to make connections which up until then had been unclear.

    28. For one, we had independently learned from Dr. Tim Sullins, Buck Scientific's new representative in the San Francisco area, that Dr. Sullins had received a letter from Nancy Gregorio soliciting business on behalf of some outfit called Edu-Chem Innovations ("Edu-Chem") which apparently was based in Florida. A copy of that letter is attached hereto as Exhibit "B." When Dr. Sullins showed me the letter he had received from Ms. Gregorio, it was clear to me from many years of dealing with Gerry DeMenna that if DeMenna had not actually authored the Edu-Chem letter, he had made significant input into its drafting. Going to Edu-Chem's website, we discovered that Edu-Chem was advertising several instruments also sold by Buck Scientific (see Exhibit "C"). We also discovered that the Edu-Chem website had a link to DeMenna's own website (Exhibit "D"). All of these discoveries crystallized our growing suspicion that DeMenna was attempting to divert the

Ohio State order from Buck Scientific to Edu-Chem, a suspicion for which we subsequently obtained other evidence.

    29.  Accordingly, on June 18, my father, in my presence, terminated DeMenna's consultancy with Buck Scientific. I will not waste the Court's time on this motion by answering each one of DeMenna's allegations concerning the circumstances of that termination, since I am told that they are irrelevant to the matters which the Court must consider on these motions.[2] I would merely ask the Court to understand that my silence does not mean that I or we agree in any material particular with DeMenna's concocted story of how he was assaulted or injured or some of the other things he claims occurred. We are confident that the truth of these matters will emerge in discovery or trial.

---

[2] DeMenna's story that his consultancy was terminated because we were annoyed at his insistence on following national security procedures is too preposterous to require extended rebuttal. Suffice it to say that on the very same day DeMenna claims he suggested we send a letter regarding the "suspicious" foreign transaction to the government, we sent our own letter to the proper authority, Agent Maryann Francischelli of the United States Customs Service in New Haven. A copy of that letter is attached as Exhibit "E" hereto: so much for our unwillingness to cooperate with the government on this transaction. The incident played no part in our decision to terminate DeMenna's consultancy, and is included by him solely in an attempt to make himself look good in the face of his improper actions.

13

Buck Scientific Was and Is Within
Its Rights to Protect Its Customers
from DeMenna's Unlawful Behavior

30. Further evidence soon emerged of DeMenna's double-dealing. It does not seem coincidental that customer "leads" obtained at conventions or on trips he attended at our expense -- such "leads" as Juniata College and Cornell, as well as OSU -- also eventuated in DeMenna's quotation of equipment and prices to these "leads" on behalf of Edu-Chem (see copies of documents attached hereto as Exhibit "F").

31. Moreover, if the Court wishes to know the sort of thing DeMenna was doing behind our back, it is only necessary to read the emails (and Edu-Chem price quotation) attached as Exhibit "G" hereto. In that email exchange Terri Boman, a customer of Buck Scientific from the University of Alabama, wrote that her university has "decided to take a closer look at purchasing the Buck GCs" and asks for a price quote on "4 Buck GCs." DeMenna responds, in pertinent part, early the next day to Ms. Boman as follows:

> "Business-wise...things are a-changing at BUCK...and confidentially it may not exist in a year...but FEAR NOT! Shining Knight Jerry will always be there to protect all his Lady Loves...and you are the only one to get a Cigar Band commitment, by the way.

14

As you know, my associate, Nancy Gregorio and I set up a "supplemental company; EDU-CHEM Innovations, to carry some stuff that the management at BUCK was not interested in promoting...and she's made arrangements to cover the other items as well...including the HPLC, GC and a line of smaller, lighter UV-Vis Specs (same company that makes the Spec-20 replacements).

I'll aks [sic] her to forward a Quotation for you on these four (4) Air-GC systems...and they will be the SAME ones that BUCK sells (since they never really made them...just bought them and re-sold them...FYI)...and the price will be the same $4995 that BUCK used to sell them for (their prices have gone up ~$500 to try and make the profits look better for their "buyer"!).

Please, too, let anyone else you may talk to about instruments know that lil' Jerry is working with EDU-CHEM and to at least give us an opportunity to provide a Quotation (since my BUCK revenues have been dropping...and I'm still trying to keep Gwen & the Kids covered financially as best I can...so every little bit helps, as they say!).  Thanks!"

Can there be stronger proof of DeMenna's disloyalty or of his outright pilfering of "leads" and customer information belonging to Buck Scientific?

    32.  Following DeMenna's termination, Buck communicated with certain suppliers and representatives regarding the reasons for DeMenna's termination, all in an effort to repair the damage we feared DeMenna had done. DeMenna is now attempting to have this Court enjoin us from discussing the source of injury to our business (the first two parts of his proposed preliminary injunction order).

Hopefully the Court will recognize that there should be no prior restraint of any such discussions or communications. Our sole interest is in restoring the business relationships of Buck Scientific which DeMenna injured. This is all the more important because as yet we do not have a full accounting of the extent to which DeMenna hurt Buck Scientific by favoring his own interest over ours.

The Other Section of the Preliminary
Injunction Sought by DeMenna Cannot
Be Used As an Excuse for Denying Us
Access to Evidence in This Action

33. In his moving papers, DeMenna acknowledges that the "smart phone" he used (and which has been retained by Buck Scientific) is, in fact, owned by Buck Scientific. The sole item which he now contends is still in the possession of Buck Scientific is a certain "phone card" which supposedly contains certain of DeMenna's personal information, including his "contact list" and personal photographs.

34. First of all, I believe that Buck Scientific paid for and owns the phone card at issue, and I attach hereto as Exhibit "H" a copy of a receipt which I believe evidences our ownership. More to the point, however, Buck Scientific has absolutely no interest in DeMenna's personal information or photographs, although why he stored them, if

16

indeed he did, on Buck Scientific property, is a question for another day.

35. However, DeMenna has not shown how he is irreparably injured by Buck's possession of this personal information: what competitive use could we possibly make of it? Of course, what _is_ of proper interest to Buck Scientific _and_ this Court is whether, among DeMenna's supposedly "personal information" stored on the phone card, there is evidence material to this lawsuit. We want to insure that all the information on that phone card can be copied and reviewed by our attorneys in order to determine its relevance to this matter. I would ask that if the Court sees fit to grant any preliminary order regarding that information, it also permit us to retain and review a copy of this material to make certain that prospective evidence does not vanish.

DeMenna's Own Theft of Corporate Opportunities Includes his Theft and Retention of Buck Scientific's Customer Data and Certain Business Correspondence, and it is Respectfully Submitted that this Court Should Enjoin DeMenna During the Pendency of This Lawsuit from Improper Competitive Use of Such Proprietary Information Belonging to Buck Scientific

36. While DeMenna complains about our potential improper use of his "personal photographs," we have obtained evidence that during the period of his consultancy

17

with Buck Scientific, DeMenna apparently downloaded an abridged list of Buck's customers and a mass of additional data about Buck's customer "leads" and prospects into DeMenna's own computer, along with several years of Buck's business correspondence. See Exhibit "I" for a copy of a page of that customer contact information: the incidents described above shows that DeMenna will not hesitate to use it for his own advantage and the advantage of Edu-Chem.

37. Accordingly, we have counterclaimed against DeMenna for the theft of Buck Scientific's proprietary information, and are asking this Court to prevent DeMenna, during the pendency of this litigation, from using any of the information from Buck Scientific's customer and prospect lists, business correspondence and other proprietary data in DeMenna's possession for his own competitive or financial advantage, or for the advantage of any other individual or company, such as Edu-Chem.

38. The relevant circumstances are as follows: Following the termination of DeMenna's consultancy, during which he supposedly was gathering the Buck Scientific equipment he had in his possession to return to us, we began to investigate whether DeMenna had retained, on one of his own computers, any proprietary information belonging to Buck Scientific. Before we could complete that

investigation, we returned his computers, along with their contents, to DeMenna, and it was only afterwards that we learned that DeMenna had downloaded onto his computer a substantial amount of Buck Scientific's proprietary information. This included an abridged customer list, containing contact information for a portion of our customers, as well as a sizeable amount of data which I may term a "marketing inquiry list" of "leads" used to prospect for customers. These "leads" cost, on average, $100 each to acquire, and we believe the acquisition value of the "leads" DeMenna downloaded onto his own computer amounts to many thousands of dollars.

39. Similarly, DeMenna apparently downloaded onto his computer approximately a decade of my father's business correspondence. Now that we know DeMenna is, and has been, involved with our competition, he should be enjoined from using any of this information to benefit himself or his associates. Potential competitive injury to Buck Scientific could be ultimately difficult if not impossible to quantify, surely vastly exceeding any conceivable use by us of DeMenna's "personal information." DeMenna will be hard-pressed to deny that he possesses this information on his computer or that it is proprietary to Buck Scientific.

We respectfully submit that he should not be allowed to profit further or at all from this information.

Conclusion

40. I respectfully request that this Court:

(a) dissolve DeMenna's temporary restraining order and deny his request for a preliminary injunction;[3] and

(b) grant our cross-motion for a preliminary injunction preventing DeMenna from utilizing the data stored on his computer which belongs to Buck Scientific and relates to our customers, prospects, and business affairs.

_____
ERIC ANDERSON

Sworn to before me this
1ST day of ~~July,~~ AUGUST 2007.

_____
Notary Public

THERESA SPREIZER
Notary Public, State of New York
No. 52-4652960
Qualified in Suffolk County
Certificate Filed in New York County
Commission Expires August 31, 2009

---

[3] Alternatively, as to the third section of DeMenna's temporary restraining order, to modify it to make certain that any evidence contained on the "phone card" at issue is retained and reviewed by our attorneys.

20