suffered (Amended Complaint, para. 64), but the allegations in his affidavit are wholly unspecific as to what such harm would be from use of the largely unspecified "personal information" on the phone card; (2) the single specific is an "attempted re-negotiation of a written contract" with MeasureNet (Id.), and this unspecified contract is neither described nor attached nor discussed; it would surely have a defined term and compensation figures, negating any need for injunctive relief, if interfered with; (3) "loss of previously negotiated economic benefits, including but not limited to equity and increased earnings" (Id., para. 70), again wholly unspecified, which by their very nature are quantifiable in monetary terms; and (4) the "loss of business opportunities" (Id., para. 77), which are purely speculative and not discussed or explained in any detail. This is patently insufficient to warrant the extraordinary remedy of preliminary relief.  In contrast, as set forth in the affidavit of Eric Anderson and discussed below, should DeMenna be allowed to further use the Company's client list or "leads," the Company will suffer genuine, irreparable damage at the hands of its patently disloyal, former at-will consultant.

Regarding DeMenna's likelihood of success on the merits, Buck Scientific submits that DeMenna will not be

8

able to prove the requisite factual elements for any of the causes of action set forth in his Amended Complaint. For example, DeMenna claims wrongful termination (Amended Complaint at pp. 9-10), yet cites no Federal or state statutes or state law decisions that prevent an independent consultant (DeMenna admits he was not an employee) on an oral contract from being terminated for any or no reason at all, let alone for theft and diversion of business, as Buck Scientific has established (see Anderson Aff. at paras. 25-28 and 30-31). Accordingly, plaintiff has failed to set forth the proper foundation for obtaining a preliminary injunction.

C.  The Few Court Decisions
    Plaintiff Relies Upon
    Are Easily Distinguishable.

Most of the cases cited by plaintiff do not involve preliminary injunctions, and the few which do, do not stand for the rule of law proffered by DeMenna. For instance, DeMenna cites Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970) for the proposition that "the threat of losing one's business constitutes irreparable harm for purposes of a temporary restraining order." Plaintiff's Memorandum of Law, p. 6.

In Semmes, defendant Ford audited the car dealership of plaintiff Semmes. Ford found significant fraud with

respect to the reimbursement the Semmes dealership had claimed from Ford for warranty repairs. Semmes first commenced a lawsuit in New Jersey Federal Court, then brought an <u>identical</u> suit in the Southern District. The New Jersey court <u>denied</u> Semmes' application for a temporary restraining order ("TRO") enjoining Ford. Three weeks later, Semmes moved for a TRO in the Southern District of New York, which was also <u>denied</u>, pending hearing on a temporary injunction. Ford thereafter served a termination of dealership notice on Semmes, so Semmes then amended its temporary injunction request before the Southern District, <u>not</u> to preclude the kind of speech or statements which are at issue in this case, but to preclude <u>the actual termination of Semmes' dealership</u>.

The <u>Semmes</u> Court made clear that a "balance of hardships" would favor a family-owned dealership that had exclusively sold Ford automobiles for over twenty years. To decide otherwise would "<u>obliterate</u>" Semmes' business. <u>See</u>, <u>id.</u> at 1205 (emphasis added). In the instant case, DeMenna, an at-will independent contractor who alleges that he did not work exclusively for the Company, has no basis, and is not even trying, to get his consultancy back. He has not come close to sharing the specific hardship the Semmes dealership faced. First, there is no written

10

contract with a definite term at here (as opposed to a Sales Agreement in Semmes), and second, there is no Federal law governing the Buck Scientific-DeMenna relationship (whereas the Ford-Semmes relationship was subject to the Federal Dealer Act, 15 U.S.C. §1222). Id., at 1206. Clearly, the vastly different facts of Semmes and the reasoning behind the Court's decision to allow an injunction in the Southern District (so that the New Jersey District Court case could proceed and Semmes would not be allowed to "judge shop"!) do not substantiate DeMenna's request for a preliminary injunction here.

Plaintiff's reliance on Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256 (2d Cir. 1995), cert. denied, 116 S.Ct. 916, 516 U.S. 1114 (1996) is also misplaced. In Securitron, the Second Circuit affirmed a jury verdict award to plaintiff of approximately $1.4M and enjoined defendants from engaging in certain acts. The Securitron defendants were found to have violated RICO and New York unfair practices law by deliberately scheming to steer open-bidding contracts for electronic locks away from the lowest bidder and/or Securitron and to defendants by writing letters to agencies, contractors and corporations that were accepting bids, falsely stating that Securitron locks had failed tests, were not UL listed, and were banned

11

from use in New York. At trial, the jury was presented with and accepted proof of the falsity of the statements and the magnitude of the damages suffered by plaintiff. See, id., at 258-262. No preliminary injunction was at issue in Securitron, and its facts and allegations are wildly dissimilar from the instant case. Further, what was ultimately prohibited was false information defendant concededly disseminated to the public.

Third, contrary to DeMenna's position that Xelus, Inc. v. Servigistics, Inc., 371 F.Supp.2d 387 (W.D.N.Y. 2005) supports a preliminary injunction, there the Western District court issued nothing more than a TRO pending a hearing on a motion for preliminary injunction. Moreover, the Xelus Court even limited the TRO, refusing to enjoin defendant from making "'any statements in commerce or trade about [plaintiff's potential purchase by another company and plaintiff's ability to service its customers should the buy-out go through]," id., at p. 391, because such a restriction would impinge on defendant's right of commercial speech. Moreover, the plaintiff in Xelus presented far more detailed and specific facts than DeMenna, establishing that the Xelus defendant's knowledge and use of information that the Xelus plaintiff was soon to announce whether or not it had secured seven-figure, long-

12

term contracts should prevent the Xelus defendant from potentially blocking these contracts. DeMenna has made no such showing here. By contrast, even Xelus underscores the cautious approach the Federal courts take when determining whether to engage in a prior restraint of speech through injunctive relief.

D. Plaintiff's Alleged Personal Information Is Company Property, and, at Minimum, the Company Should Be Allowed to Copy Such Information to Be Reviewed by Its Attorneys for Evidence in This Lawsuit.

As set forth in the Anderson Affidavit, at paras. 33-34, the "smart phone" (and memory card) used by DeMenna were the property of the Company. As such, the Company has every right to retain these items and the information contained on them as the Company's business property. See, id., para. 35.

Furthermore, Buck Scientific has presented evidence that DeMenna, while consulting for the Company, (a) downloaded Buck Scientific's abridged customer list, sales "leads," and other proprietary business information onto his computers, Id., para. 36 and Exhibit "G", and (b) attempted to divert Buck Scientific's customers. Buck Scientific should be permitted, at a minimum, to duplicate and have its attorneys review the information at issue on

13